# STATE OF MICHIGAN

# COURT OF APPEALS

SHARON BEAR,

        Plaintiff-Appellant,

v

KENNETH E. PRATHER and KENNETH E.
PRATHER, SR.,

        Defendants-Appellees,

and

WALTER BRIGGS CONNOLLY, JR. and
CONNOLLY, RODGERS & SCHARMAN,

        Defendants.

UNPUBLISHED
December 4, 2014

No. 313378
Oakland Circuit Court
LC No. 2011-122184-NM

Before: HOEKSTRA, P.J., and SAWYER and GLEICHER, JJ.

PER CURIAM.

Plaintiff Sharon Bear fell victim to a fraudulent investment scheme hatched by Lee S. Ruhl. Ruhl owned a company called Ruhl Real-Estate Investments. He also worked for the Golden Mortgage Corporation, which brokered the mortgages that supplied cash for Ruhl's deals. When the investment dividends Ruhl promised to Bear failed to materialize, she sued Ruhl, Ruhl Real-Estate Investments, and Golden Mortgage. Bear settled with the Ruhl defendants, and the circuit court summarily dismissed Golden Mortgage.

In *Bear v Ruhl*, unpublished opinion per curiam of the Court of Appeals, issued January 27, 2011 (Docket No. 294839) (*Bear I*), this Court affirmed the circuit court's grant of summary disposition to Golden, holding that Bear had failed to present evidence of Golden's involvement in Ruhl's investment dealings. Bear then sued her counsel, defendant Kenneth E. Prather and his law firm, defendant Kenneth E. Prather, Sr., P.C., charging legal malpractice. The circuit court dismissed the legal malpractice case, finding it barred under the attorney judgment rule and determining that Bear could not prove causation. Because we affirm the circuit court's causation ruling, we need not address the attorney judgment rule.

-1-

I.

*Bear I* set forth the pertinent underlying facts of this case as follows:

> This action stems from investment transactions Bear made with Ruhl and his company, Ruhl Real-Estate Investments (RREI), in the fall of 2006.[1] Bear was introduced to Ruhl in the summer of 2006. According to Bear, Ruhl offered her a plan whereby she could use the substantial equity in her home[2] to generate income via guaranteed investments in RREI, and then use that income to qualify for a new mortgage.

> On October 27, 2006, Bear filled out a residential mortgage application with Ruhl's assistance, stating income reflecting the earnings expected from Bear's investment in RREI.[3] On October 31, 2006, Bear invested $100,000 with Ruhl pursuant to a contract backdated to October 9, 2006. According to this contract, RREI was to repay Bear $2,783.07 per month for 48 months, or a total of $133,587.36.

> On or about November 30, 2006, Bear signed an income certification, from New Century Mortgage Corporation (New Century), indicating that her gross monthly income would be at least $8,500. On December 5, 2006, Bear closed on a new 30-year adjustable rate mortgage with New Century, brokered by Golden, in the amount of $347,400. Among the loan documents Bear signed was a document titled "Prepayment Rider Adjustable Rate Loan." This Rider provided in part that Bear had the right to make a full or partial prepayment of the loan at any time, but that if she were to do so in the first two years of the loan, she was required to pay a prepayment charge equal to one percent of the amount of the prepayment. As broker of Bear's New Century mortgage, Golden was paid $5,219.00, of which $4,309 was identified as an origination fee and $595 as a processing fee.

> After paying the balance of her existing mortgage, closing fees and settlement charges, Bear received net proceeds of approximately $171,000 from the refinancing. She then invested an additional $162,000 with Ruhl and RREI. Pursuant to this second investment contract, Ruhl and RREI were to repay Bear $4,508.58 per month for 48 months, or a total of $216,426.24.

> * * *

> RREI made monthly payments to Bear on the investment contracts through December 2007.[4] On January 8, 2008, Ruhl signed an agreement promising to pay Bear the full balance owed to her on the two contracts, together with penalty surcharges of $10,000 per contract, within 60 to 90 days.[5] Ruhl/RREI did not make any additional payments thereafter.

_____

[1] RREI was formed by Ruhl while he was employed by Golden, but before Ruhl became acquainted with Bear.

[2] At the time, Bear's home was valued at approximately $376,000, and her mortgage balance was approximately $168,675.

[3] According to Bear, her residential mortgage application stated monthly income of $8,500. Bear reported income of approximately $1,000 per month on her previous year's income tax return.

[4] RREI made 14 payments to Bear on her first investment contract, leaving a balance owing of $76,602.81, and 12 payments on the second contract, leaving a balance owing of $130,060.25.

[5] This agreement also addresses an additional $30,000 investment made by Bear, on August 27, 2007, for the purchase of property on Fordham Street, in Detroit, by Ruhl/RREI with the intentions of reselling the property at a later date for a profit. This investment is mentioned as additional factual support for Bear's claims, but is not directly at issue here. [*Bear I*, unpub op at 1-3.]

---

Bear's initial complaint alleged that Golden Mortgage was vicariously liable for Ruhl's fraud. See *id.* at 3. Golden denied any participation in Ruhl's investment dealings with Bear. According to Golden, Ruhl's involvement with Bear was separate and distinct from Ruhl's employment role and responsibilities at Golden. Golden sought summary disposition under MCR 2.116(C)(8) and (C)(10), contending that no evidence linked Golden to Ruhl's investment scheme. In support of its motion, Golden Mortgage presented the deposition testimony of Richard Ruby, Golden's president and owner, and Ruhl. Both disclaimed Golden's involvement in Ruhl's investment activities. *Id.*

Bear's response consisted of her own affidavit. This Court summarized her averments as follows:

> Bear states that all of her communications with Ruhl occurred by way of Golden phone numbers and email addresses, and that all of their meetings were held at Ruhl's Golden office. Bear signed the investment contracts at Ruhl's Golden office and the signatures were witnessed by Golden employees. Bear also states that Ruhl advised her she could speak to his Golden assistant, Kelly Sharrow, regarding any questions she might have. Additionally, according to Bear, Ruhl kept her investment portfolio in his Golden office, the RREI checks Bear received bore the Golden address, and she picked up payments from RREI at Golden's offices, from Ruhl or another Golden employee. [*Id*. at 2.]

These facts, *Bear I* held, did not subject Golden to liability for Ruhl's acts.

This Court explained that vicarious liability arises from principal-agent and master-servant relationships, and permits the fact finder to impute the agent's or servant's fault to the

principal or master. *Id*. at 6. However, a master bears no responsibility for torts committed by a servant acting outside the scope of the servant's employment. *Id.* "An act is considered to be outside the scope of employment if the employee acts outside his employment to accomplish a purpose of his own." *Id.* Nevertheless, this Court acknowledged, "[v]icarious liability may also be imposed where the employee commits the act while involved in a service of benefit to the employer." *Id.*

This Court concluded that Bear failed to set forth any facts suggestive of an agency relationship between Ruhl and Golden, or that Ruhl's investment activities had benefitted Golden. Bear's affidavit did not suffice, the Court elucidated, because:

> both Ruhl and Ruby indicated unequivocally that Golden had no knowledge of Ruhl's investment activities and that those activities were not within the scope of his Golden employment. And, Bear did not submit any evidence other than her own affidavit to establish otherwise. The assertions she did make in her affidavit were either conclusory or lacked a sufficient factual basis to establish such knowledge. . . . None of the investment documents mention Golden or refer to Bear obtaining a mortgage or to mortgage loans. Further, only one of the three investments Bear would ultimately make with Ruhl was made with funds obtained from her refinancing. There was no evidence that Golden employees commonly engaged in offering investment services or advice to clients, or that the offering of investment advice was within Golden's "enterprise." Rather, the only evidence produced indicated the opposite. Likewise, the "instrumentality by which the harm is done" was not furnished by Golden and, again, was not within the usual operations of Golden as a mortgage company. [*Id.* at 7-8 (citations omitted).]

As no evidence supported "that Ruhl's investment scheme was undertaken in order to generate a refinancing for the purpose of benefitting Golden," the circuit court properly granted summary disposition of this claim. *Id*. at 8-9.

The *Bear I* Court then considered whether the circuit court had erred by denying Bear's motion for reconsideration of the circuit court's summary disposition ruling.[1] With the motion, Bear presented an addendum to her affidavit and four new affidavits obtained from witnesses identified on her witness list. *Id.* at 13. Bear argued that this additional material substantiated her vicarious liability and agency claims. The *Bear I* panel held that the circuit court had not abused its discretion by refusing to consider the affidavits, as the information they contained "could have been obtained, but was not offered, in the first instance." *Id.* at 14.

---

[1] The motion was denominated as one "to Amend Opinion and Set Aside Order Granting Defendant-Golden Mortgage Corporation's Motion for Summary Disposition," but this Court construed it as a motion for reconsideration under MCR 2.119(F)(3).

Bear then filed this legal malpractice action, alleging that her counsel in the underlying case failed to timely file the affidavits and neglected to conduct adequate discovery. Bear contends that had supplemental information been presented to the circuit court before the summary disposition motion, her vicarious liability and agency claims would have survived. The attorney defendants moved for summary disposition, arguing that attorney judgment rule described in *Simko v Blake*, 448 Mich 648; 532 NW2d 842 (1995), shielded them from suit.

The circuit court found that defendants' failure to timely file the affidavits constituted a mere error of judgment under *Simko* and, regardless, had not proximately damaged Bear, as the affidavits did not recite any facts supporting Golden's vicarious liability for Ruhl's actions. We concur with the circuit court's proximate cause analysis.

II.

We review de novo the circuit court's summary disposition ruling. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A court may grant summary disposition under subrule (C)(10) if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id*. "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). When the record leaves open an issue on which reasonable minds could differ, a genuine issue of material fact exists that precludes summary disposition. *West*, 469 Mich at 183. A court may not make findings of fact when deciding a summary disposition motion. *Jackhill Oil Co v Powell Prod, Inc*, 210 Mich App 114, 117; 532 NW2d 866 (1995).

To prove legal malpractice, a plaintiff must establish, among other elements, that the defendant's negligence was a proximate cause of the plaintiff's injury. *Charles Reinhart Co v Winiemko*, 444 Mich 579, 585-586; 513 NW2d 773 (1994). Where the success of the underlying litigation depends solely on legal principles, proximate cause presents a question of law for the trial court to decide. See *id*. at 589-590.

Three of the four new affidavits submitted by Prather were signed by other victims of Ruhl's investment strategy. They detailed the promises Ruhl made, and the money each lost. According to the affidavits, all three victims obtained second mortgages through Golden, and all three believed that Rick Ruby, Golden's president, knew of Ruhl's scheme. The fourth affidavit, signed by the pastor of one of the victims, describes several interactions with Ruhl but contains no facts documenting Ruby's involvement in Ruhl's investment activities. Similarly, the addendum to Bear's affidavit merely reiterates that she attended meetings with Ruhl at the Golden office and that she considered "Golden and Ruhl as one entity."

None of the allegations factually connected Ruby or Golden with the investment strategies in which Bear and the other victims invested. The affidavits lack information demonstrating that Golden exercised control over Ruhl's activities, or authorized Ruhl to represent and bind Golden. While the affidavit averments support an inference that Golden may

have offered incentives to Ruhl to act in ways that furthered Golden's mortgage business, no evidence supports that Golden controlled Ruhl's investment activities or possessed any awareness of its details. Accordingly, the additional information would not have saved Bear from summary disposition.

 We affirm.

      /s/ Joel P. Hoekstra
      /s/ David H. Sawyer
      /s/ Elizabeth L. Gleicher